UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE MASON AND DIXON LINES, INC.,
UNIVERSAL AM-CAN, LTD., and MASON
DIXON INTERMODAL, INC.

                Plaintiffs,

v.

KIRK T. STEUDLE and TED B. WAHBY,

                Defendants.

and

E.L. HOLLINGSWORTH & CO., doing
business as CHIEFTAIN CONTRACT
SERVICES, CHURCHILL TRANSPORTATION
INC., SUPERIOR GLOBAL, INC., and RUSH
TRUCKING COMPANY

                Intervenor Plaintiffs,

v.

KIRK T. STEUDLE, TED B. WAHBY, and
DETROIT INTERNATIONAL BRIDGE CO.,

                Defendants.
_____/

Case Number 10-12285
Honorable David M. Lawson

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO
DISMISS, DENYING MOTIONS AND EMERGENCY MOTIONS FOR
PRELIMINARY INJUNCTION, DISMISSING AMENDED AND INTERVENOR
COMPLAINTS, AND DENYING OTHER MOTIONS AS MOOT**

The plaintiffs and intervening plaintiffs are all common carrier companies operating tractor

trailers transporting goods domestically and internationally.  They allege that they regularly use the

Ambassador Bridge (the Bridge) to make the passage from the United States to Canada.  They have

filed a complaint against officials of the Michigan Department of Transportation (MDOT) in their

official capacities alleging that MDOT has denied them access to the Bridge via recently constructed but not yet opened access ramps that would provide a convenient route to the Bridge from certain interstate highways.  The plaintiffs contend that the defendants' actions (or, more accurately, inaction) violate several federal statutes and the Commerce and Supremacy Clauses of the Constitution.  The complaint also contains a nuisance count under state law.  The defendants have filed a motion to dismiss, arguing that the Court lacks subject matter jurisdiction because the federal statutes on which the plaintiffs rely do not provide a private right of action; the complaint fails to state valid claims; the action is barred by the Eleventh Amendment; and the Court should abstain from hearing this case in deference to a pending state court action between MDOT and the private owner of the Bridge.  The Court heard oral argument from the parties in open court on November 29, 2010.  The Court finds that at least one of the federal claims asserted by the plaintiffs may be asserted as a private right of action, but the state has made no order, regulation, or action that has the force of law that is preempted by the Constitution or federal law; therefore the plaintiffs claims over which this Court has subject matter jurisdiction are meritless.  The Court declines to exercise supplemental jurisdiction over the remaining state law claim.  Therefore, the defendants' motion to dismiss will be granted.

## I. Facts

At the root of the present controversy is a dispute between MDOT and the Detroit International Bridge Company (DIBC) over the construction of access facilities from Interstate I-75 and I-96 highways to the Bridge, which is located in southwest Detroit, Michigan.  The construction project is known as the Gateway Project.  MDOT and DIBC entered into a contract in 2004 to divide the responsibilities for constructing various parts of the project.  MDOT filed a lawsuit in state court

alleging that it completed its part of the project, but DIBC has failed to perform its part of the construction, and in some cases has built permanent structures in the way of easements to landlocked parcels belonging to third parties.  According to the state court's opinion ordering specific performance, DIBC has yet to construct a dedicated ramp to 23rd Street, a local thoroughfare; it built toll booths in the way of the easement, and other facilities in the way of a proposed four-lane access road; and it has not built a proper access road to a welcome center on 21st Street.  In addition, DIBC "failed to construct a two lane truck road, an access easement, safeguard gate system, and access drive and gate as required by the agreement."  Mot. Dismiss, Ex. 1, *MDOT v. DIBC*, No. 09-015581-CK, Opinion and Order at 6 (Wayne Cnty. Cir. Ct., Feb. 1, 2010)) at 6.  The state court found that these facts were not in dispute.

Apparently, MDOT has completed its part of the project, including access ramps from the interstate highways to the Bridge property, but it has refused to open the ramps until DIBC finishes its work.  Although the Bridge is a major route of international travel, it is privately owned.  *See* Act of Mar. 4, 1921, Ch. 167, 41 Stat. 1439 (1921).  This Act of Congress required DIBC to comply with the Bridge Act of 1906, 33 U.S.C. § 491 *et seq.*, which mandates that bridge operators obtain the approval of the United States Secretary of Transportation for "plans and specifications and the location of such bridge and accessory works" before commencing a construction project.  33 U.S.C. § 491.  The statute also states that " it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Secretary."  *Ibid.*  When the Bridge was initially built, motor vehicles seeking to access the Bridge were required to exit the highway system and travel through city streets in Detroit.  In 1998, Congress passed legislation authorizing funds for the

-3-

Gateway Project, which consists of "improvements to access roads and construction of access roads, approaches, and related facilities (such as signs, lights, and signals) necessary to connect the Ambassador Bridge in Detroit, Michigan, to the Interstate [Highway] System." Transportation Equity Act for the Twenty-First Century, Pub. L. No. 105-178, § 1217, 112 Stat. 107, 214 (1998). Michigan obtained federal funds to help with this project, and it states that completing the project according to plans and specifications is a requirement of retaining the funding.

The plaintiffs have characterized MDOT's refusal to open the ramps as a "Closure Order." That denomination is a misnomer at best and perhaps a deliberate mischaracterization at worst. There is no "order" as such closing the ramps. In fact, they never have been opened. While the ramps remain closed, the plaintiffs contend that they must resort to existing surface roads through Detroit to gain access to the Bridge. The plaintiffs' description of the State's maintenance of the status quo likely is an effort to frame the inertia as state action. The defendants acknowledge that MDOT has finished its part of the project, but they insist that they cannot open the ramps until DIBC has completed its construction, lest federal funding be jeopardized.

The plaintiffs' filed a complaint, followed by an amended complaint three weeks later, which contains five counts. Count I seeks a mandatory injunction compelling the defendants to open the ramps to vehicle traffic; it is based on 49 U.S.C. §§ 10101-16106, which include the Interstate Commerce Commission Termination Act (ICCTA) and the Federal Motor Carrier Safety Improvement Act (MCSIA). Count II is based on 42 U.S.C. § 1983, alleging a violation of the Supremacy Clause and the Commerce Clause, and prays for injunctive and declaratory relief. It is not clear whether damages are sought under this count. Count III alleges a violation of 49 U.S.C. §§ 14501 and 10501, which prohibit states from enacting laws and regulations "related to a price,

route, or service of any motor carrier." Count IV pleads common law nuisance under state law. Count V alleges a violation of 49 U.S.C. § 31114 (part of the Surface Transportation Assistance Act) and an implementing regulation, 23 C.F.R. § 658.19, which prohibit states from enacting laws and regulations restricting access to the interstate highway system, except in cases of safety considerations. The common thread among these counts is that the plaintiffs presently are required to drive on city streets to gain access to the Bridge; if the ramps were open, they could save considerable time and money by driving directly from the highway onto the Bridge.

The plaintiffs filed a motion for a preliminary injunction, on which the Court held a hearing. The motion remains pending. The plaintiffs also filed a motion to strike an affidavit filed by an MDOT official and a motion for discovery. In addition, three other trucking companies, E.L. Hollingsworth & Co., Churchill Transportation Inc., Superior Global, Inc., and Rush Trucking Company, moved to intervene as plaintiffs. On December 1, 2010, the Court granted the motions and allowed Superior Global, Inc. to file an intervenor's complaint. The intervening plaintiffs filed their complaint on December 6, 2010 alleging substantially the same federal claims as the original plaintiffs, but they added DIBC as a defendant, and they make specific reference to state highway M-85 as a point of access to the Bridge. They also avoid the nomenclature "Closure Order," and instead characterize the contract between MDOT and DIBC establishing the Gateway Project as a "regulation."

Since oral argument of the motion to dismiss in this case, the plaintiffs and intervening plaintiffs filed emergency motions for preliminary injunctions seeking access to the Bridge via the closed ramps when weather conditions closed the Blue Water Bridge connecting Port Huron,

Michigan to Sarnia, Canada, resulting in lengthy traffic delays crossing the Ambassador Bridge. The decision on the present motion to dismiss renders those motions moot.

## II.  Discussion

Although the defendants cite additional rules of procedure, their argument indicates their motion to dismiss is based on lack of subject matter jurisdiction and the failure of the plaintiffs to state claims for which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(1), (6). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)).  The present motions attack the face of the jurisdictional allegations in the amended complaint.

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir.1996). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).  "However, while liberal, this standard of review does require more than the bare assertion

of legal conclusions." *Ibid.* "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. "[A] court may accept 'matters outside the pleadings,' but in doing so it generally must treat the motion 'as one for summary judgment under Rule 56.'" *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citing Fed. R. Civ. P. 12(d)). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. . . . In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335-336 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Sixth Circuit has warned that attacks on the merits should not be confounded with jurisdictional challenges, and has admonished courts to be more exacting when addressing challenges that are phrased as an attack on jurisdiction:

> In two very recent decisions, the Supreme Court has admonished courts to use the term "jurisdiction" with more precision, describing the term as "a word of many, too many, meanings," *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). In *Kontrick*, a unanimous Court held that time requirements of Federal Rules of Bankruptcy Procedure 4004 and 9006 did not implicate subject-matter jurisdiction, but were instead "claim-processing rules." *Id.* at 455. Just over one year later, in *Eberhart v. United States*, 546 U.S. 12 (2005) (per curiam), the Supreme Court similarly described Federal Rule of Criminal Procedure 33 with its time limitations as a nonjurisdictional "claim-processing rule." "Clarity would be facilitated," the Supreme Court

> remarked, "if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Id.* at 405 (quoting *Kontrick*, 540 U.S. at 455). "Characteristically, a court's subject-matter jurisdiction cannot be expanded to account for the parties' litigation conduct. . . ." *Kontrick*, 540 U.S. at 456.

*Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006).

Heeding that warning, this Court also is mindful of Supreme Court precedent holding that federal question jurisdiction under 28 U.S.C. § 1331 will not be found when the federal statute invoked by a plaintiff does not create a private right of action. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 814 (1986) (holding that "the congressional determination that there should be no federal remedy for the violation of [a] federal statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction"); *see also Care Choices HMO v. Engstrom*, 330 F.3d 786, 788 (6th Cir. 2003).

### A.  Interstate Commerce Commission Termination Act

The Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10101 *et seq.*, abolished the Interstate Commerce Commission and transferred most its responsibilities concerning rail and motor vehicle carrier transportation to the Secretary of Transportation and the Surface Transportation Board. *See* 49 U.S.C. § 13501; *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 759 n.1 (2004).  The provision relied upon by the plaintiffs, 49 U.S.C. § 14501 (actually enacted as part of the Federal Aviation Administration Authorization Act), states:

> Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation,

> or other provision having the force and effect of law related to a price, route, or
> service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  Subsection 14501(c)(2) exempts from this preemption provision "the safety regulatory authority of a State with respect to motor vehicles" and other limitations based on size, weight, or cargo.  *Id.* § 14501(c)(2)(A).

The defendants argue that this section does not create a private right of action.  However, courts, including the Supreme Court, have found that section 14501(c)(1) furnishes the authority for private parties to challenge state laws and local ordinances that purport to regulate motor carrier routes, usually in the context of tow truck operator regulations.  *See, e.g., City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424 (2002); *Auto. Club of N.Y., Inc. v. Dykstra*, 520 F.3d 210 (2d Cir. 2008); *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136 (2d Cir. 2006) (Sotomayor, J.); *Ware v. Tow Pro Custom Towing & Hauling, Inc.*, 289 F. App'x 852 (6th Cir. 2008) (unpublished).  The preemptive language in the statute is enforceable through the Supremacy Clause to invalidate conflicting state and local laws.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").

Section 14501(c)(2)(A) does not provide a source of relief for the plaintiffs and intervening plaintiffs in this case, however.  It is undisputed that the plaintiffs fall within the statutory definition of motor carriers.  49 U.S.C. § 13102(14).  However, the plaintiffs have pointed to no state law or regulation enacted or enforced by the defendants in violation of federal law.  Instead, the plaintiffs challenge what they describe as the "Closure Order" — the "MDOT's *ad hoc* administrative actions

and unilateral decision to effectively close the Interstate Connecting Ramps by barricading and blockading the ramps" and "caus[ing] construction equipment, MDOT barricade cones, construction debris, and mounds of dirt and concrete to be placed on the Interstate Connecting Ramps with the intent to stultify, directly inhibit and prohibit the direct and efficient flow of international travel over the Ambassador Bridge." Amend. Compl. ¶¶ 28-29. The plaintiffs have not provided a copy of any order or any other evidence tending to show that administrative action was taken or that a decision was made by the MDOT or MSTC. The cases determining whether section 14501(c)(1) effects a preemption involve state and local laws and regulation. *See, e.g., Ours Garage*, 536 U.S. at 428 (regulation); *Dykstra*, 520 F.3d at 211-12 (administrative scheme); *Loyal Tire*, 445 F.3d at 139 (municipal ordinance); *Ware*, 289 F. App'x at 856 (storage fee alws); *cf. Tillison v. Gregoire*, 424 F.3d 1093, 1095-06 (9th Cir. 2005) (state or local law); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) (law); *cf. INS v. Chadha*, 462 U.S. 919, 986 n.19 (1983) (rule making has the force and effect of law).

The question remains whether the state's inaction amounts to an "other provision having the force and effect of law." 49 U.S.C. § 14501(c)(1). The Court does not believe it does. The plaintiffs try to help their case by characterizing the non-opening of the ramps as a "Closure Order." That nomenclature is misleading. The ramps were never open, so there was never any "closure"; and there is no "order" effectuating any action by the state officials. Instead, the ramps remain closed because of a dispute between the State and its construction partner over responsibility for finishing the project in accordance with plans approved by the U.S. Department of Transportation.

Nor does the contract between MDOC and DIBC constitute a provision having the force or effect of law. The Gateway Project Agreement is just that: an agreement. It was not enacted by a

legislative or administrative authority, and it does not constitute a law, rule, pronouncement, regulation, or prescription.  It is a memorialization of the mutual promises and undertakings of the subscribing parties, no more no less.

Pronouncements that do not follow prescribed legislative or rule making procedures cannot be said to constitute provisions having the force and effect of law.  For instance, in *Martin v. Stites*, 4 F. App'x 621 (10th Cir. 2001), the Tenth Circuit examined the possible preemption of two county towing policies, one of which divided the county "geographically into eastern and western portions for purposes of assigning non-preference tow truck calls." *Id.* at 623-24.  The court determined that a county policy did not have the "force and effect of law" because it did not meet the state process or requirements for formal legislation, did not provide guidelines or standards to govern the sheriff's conduct, could be changed unilaterally by the sheriff at any time, and provided no repercussions for violations of the policy.  *Id.* at 627-29.  The same obtains here.  The state officials simply refuse to open the ramps.  That is an executive decision, not an legislative or administrative one.  It was not made pursuant to a "provision" and does not have the "force or effect of law."

The amended and intervening complaints, therefore, fail to describe a "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property" being enforced these defendants that is subject to federal preemption.  The claim by the plaintiffs and intervening plaintiffs founded on 49 U.S.C. § 14501(c)(1) and the Supremacy Clause fails as a matter of law.

B.  Motor Carrier Safety Improvement Act

The plaintiffs' and intervening plaintiffs' claim under the Motor Carrier Safety Improvement Act (MCSIA) fairs no better. That Act states as its purposes the improvement of the federal motor carrier safety program through the establishment of a permanent government agency, the Federal Motor Carrier Safety Administration, and the reduction of large-truck accidents through increased inspection and enforcement measures. Pub. L. No. 106-159, § 4, 113 Stat. 1748, 1749. The plaintiffs have not developed an argument as to how the defendants' conduct might collide with a provision of this statute. By its terms, the Act addresses matters of highway safety, which traditionally has remained within the province of the States. Consequently, the likelihood that a provision of this legislation would preempt state law is remote.

There is no Sixth Circuit precedent dealing with this particular legislation. However, in 1993, the Sixth Circuit grappled with the predecessor to the present statute, the Motor Carrier Safety Act (MCSA), and determined that it "does not purport to set up a comprehensive regulatory scheme, but to 'establish minimum Federal safety standard for commercial motor vehicles.'" *Interstate Towing Ass'n, Inc. v. City of Cincinnati,* Ohio, 6 F.3d 1154, 1160 (6th Cir. 1993) (quoting 49 U.S.C. app. § 2505(a)). The Sixth Circuit also noted that "[i]n no field has [the Supreme Court's] deference to state regulation been greater than that of highway safety regulation" and held that the MCSA did not preempt state motor carrier regulation "on a wholesale basis." *Id.* at 1162 (quoting *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 444 (1978)). Other courts have reached similar conclusions. *See North Carolina Motorcoach Ass'n v. Guilford Cnty. Bd. of Educ.*, 315 F. Supp. 2d 784, 801-04 (M.D.N.C. 2004); *Sadorf v. Valdez*, No. 04-1563, 2004 WL 1375534, at *2-3 (N.D. Ill. Jun 17, 2004).

Because the MCSIA governs safety issues that are largely irrelevant to the plaintiffs' challenge to their lack of access to the ramps in this case, it does not on its face preempt the state's inaction, nor would the "Closure Order" or the Gateway Project Agreement conflict with any of the MCSIA's provisions. Therefore, the plaintiffs' and intervening plaintiffs' claims of preemption under this statute fail.

Nor does the Court find a private right of action in this legislation that is material to the present dispute. Courts have reached inconsistent results on whether 49 U.S.C. § 14704(a)(2) creates a private right of action. *Compare Marrier v. New Penn Motor Express, Inc.*, 140 F. Supp. 2d 326 (D. Vt. 2001), *with Jones v. D'Souza*, No. 06-00547, 2007 WL 2688332, at *7 (W.D. Va. Sept. 11, 2007). But that statute deals with "damages sustained by a person as a result of an act or omission of that carrier or broker." 49 U.S.C. § 14704(a)(2). The statute creates no private right of action against state officials.

The plaintiffs and intervening plaintiffs have not stated a claim in their pleadings that can be sustained by the Motor Carrier Safety Improvement Act.

### C.  42 U.S.C. § 1983

The plaintiffs also allege that they are entitled to relief under 42 U.S.C. § 1983. Section 1983, however, does not itself create federal rights, but only provides judicial relief for the violation of rights arising under the Constitution or laws of the United States. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). The main source of the federal right upon which the plaintiffs and intervening plaintiffs rely is the section of the Interstate Commerce Commission Termination Act (via the Supremacy Clause) discussed above, 49 U.S.C. § 14501(c)(1).

-13-

In a well-reasoned opinion, the Second Circuit held that section 14501(c)(1) does not provide an individual right of action on its own or enforceable through 42 U.S.C. § 1983. *Loyal Tire*, 445 F.3d at 149 (explaining that "'[a] claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law" under § 1983 and that "'[a] claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity") (quoting *Western Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225 (2d Cir. 1987)). Determining whether section 14501(c)(1) is the source of a private right requires an analysis of the statutory text and context in light of the factors set out in *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285-89 (2002), and *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).

The Supreme Court has held that the critical question that determines whether legislation can be enforced privately is "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ.*, 536 U.S. at 285. In *Gonzaga University*, the Supreme Court acknowledged that confusion may have resulted from the conflation of its cases dealing with whether a statute created an implied private right of action with those cases determining whether there were private rights enforceable under section 1983. The Court held, however, that "in either case we must first determine whether Congress intended to create a federal right." *Id.* at 283 (emphasis omitted). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). The Court stated that the statute unambiguously must confer "rights," not merely "benefits." *Id.* at 283. "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Id.* at 290. "[W]here the text and structure of a statute

-14-

provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

In *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006), the Sixth Circuit explained:

> In ascertaining "whether Congress intended to create a federal right" in the freedom-of-choice provision, . . . the Court has directed us to look at three factors, *see Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997); *see also Westside Mothers v. Haveman*, 289 F.3d 852, 862-63 (6th Cir. 2002). "First, Congress must have intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340. In answering this initial inquiry, courts look for a statutory right or "*individual* entitlement," *Gonzaga*, 536 U.S. at 287, that is "unambiguously conferred," *id.* at 283, by the use of "rights-creating language," *id.* at 284 n.3. An "aggregate focus" unconcerned "with whether the needs of any particular person have been satisfied," *id.* at 288 (internal quotation marks omitted), is insufficient; the statute must be "phrased in terms of the persons benefitted," *id.* at 284, and use "individually focused terminology," *id.* at 287. "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41 (internal quotation marks omitted). "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341.

*Harris*, 442 F.3d at 461. If a plaintiff can make these three showings, "a rebuttable presumption [arises] that the right is enforceable under § 1983," *ibid.* (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)), which the defendant can defeat by showing that the statute's comprehensive enforcement scheme is incompatible with individual enforcement.

In *Loyal Tire*, the Second Circuit reasoned that although section 14501 prohibited states and local governments from regulating motor carriers, it was not phrased in terms of the person benefitted. *Loyal Tire*, 445 F.3d at 150 ("The statute, which provides that a state or municipality may not 'enact or enforce' certain kinds of laws governing motor carriers of property, 49 U.S.C. § 14501(c)(1), is not 'phrased in terms of the persons benefitted.'" (quoting *Cannon*, 441 U.S. at 692

n.13)).  The court also found that "because the statute focuses on the regulated actors (state and local authorities), it has an aggregate, rather than an individual, focus." *Ibid.*

This Court agrees with that reasoning and finds that 49 U.S.C. § 14501(c)(1) does not create a private right of action that can be enforced through section 1983.  The Court already determined that there is no private right of action material to this case under the Motor Carrier Safety Improvement Act.

### D.  Surface Transportation Assistance Act

The plaintiffs also make reference in their amended complaint to a section of the Surface Transportation Assistance Act and one of its implementing regulations, 49 U.S.C. § 31114 and 23 C.F.R. § 658.19.  That statute states:

> (a) Prohibition on denying access.  A State may not enact or enforce a law denying to a commercial motor vehicle . . . reasonable access between-
> > (1) the Dwight D. Eisenhower System of Interstate and Defense Highways . . . ; and
> > (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers, motor carriers of passengers, or any truck tractor-semitrailer combination . . . .
> (b) Exception. This section does not prevent a State or local government from imposing reasonable restrictions, based on safety considerations, on a truck tractor-semitrailer combination . . . .

49 U.S.C. § 31114.  The Act "governs . . . access to and from the national Interstate system" and "guarantees commercial motor vehicles 'reasonable access,' free from State interference, between the Interstate and terminals," while "cabin[ning] the degree and manner in which state and local governments may restrict commercial vehicles' access to and from the Interstate." *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1032-33 (7th Cir. 2008) (footnotes omitted).  The Act also "seeks to increase construction and safety on the interstate and national highway systems" and provides federal funding to the states for construction, conditioned on agreements with the Secretary of

Transportation to comply with the terms and conditions of the regulations set out in Title 23. *New Hampshire v. Ramsey*, 366 F.3d 1, 7 (1st Cir. 2004) (citing 23 C.F.R. § 630.112(a)).

Section 31114 uses the term "reasonable access." The corresponding regulation, 23 C.F.R. § 658.19, provides in relevant part:

> (a) No State may enact or enforce any law denying reasonable access to vehicles with dimensions authorized by the STAA between the NN and terminals and facilities for food, fuel, repairs, and rest. In addition, no State may enact or enforce any law denying reasonable access between the NN and points of loading and unloading to household goods carriers, motor carriers of passengers, and any truck tractor-semitrailer combination . . . .
> . . .
> (d) No State may enact or enforce any law denying access within 1 road-mile from the National Network using the most reasonable and practicable route available except for specific safety reasons on individual routes.
> . . .
> (h) States shall ensure compliance with the requirements of this section for roads under the jurisdiction of local units of government.

23 C.F.R. § 658.19.

The statute focuses on "law[s]" and regulations and has been construed to permit states to "exercise their police powers over state highways and local roads," *Aux Sable Liquid Prods.*, 526 F.3d at 1036, over matters beyond just "safety considerations," *N.H. Motor Transp. Ass'n v. Town of Plaistow*, 67 F.3d 326, 329-30 (1st Cir. 1995). However, states may not "deny all methods of access to the Interstate from the Terminal for fully loaded propane trucks." *Aux Sable Liquid Prods.*, 526 F.3d at 1037.

The plaintiffs seek access from a highway to an international bridge. Whether the Bridge falls within the definition of a "terminal" is debatable. However, even assuming that it does, the preemption provision of the STAA explicitly applies only to "a law," and the plaintiffs have pointed to no law enacted or enforced by the defendants. As discussed above, neither the "Closure Order"

-17-

nor the Gateway Project Agreement has the force or effect of law, and they do not fall within the terms of this statute.

Moreover, the plaintiffs have not alleged that they do not have reasonable access to the Bridge.  To the contrary, in their amended complaint, they acknowledge that they continue to access the Bridge via city streets.  Although their briefs seem to suggest that this access route is a "detour" that has not been in place for very long, the defendants cite law tending to show that the highway was never connected to the Bridge previously via a direct route, indicating that the city streets were historically the only means of access to the Bridge.  The plaintiffs do not argue that this route has always been unreasonable, but seem to suggest only that it is unreasonable since the date that the construction of the ramps was allegedly completed.  However, *Aux Sable Liquid Prods.*, 526 F.3d at 1036-37, states that the State does not violate the STAA if it provides an alternate route of access that is merely less preferable.  Such is the case here.  The STAA does not preempt the State's decision to not open the ramps until the entire project is substantially complete.

The STAA regulations, specifically 23 C.F.R. § 658.19(d), prohibits a State from "enact[ing] or enforc[ing] any law denying access within 1 road-mile from the National Network [of highways] using the most reasonable and practicable route available."  Once again, however, the regulation on its face applies only to "law[s]"; the plaintiffs have pointed to no state law violating this regulation.

The plaintiffs amended complaint states no cognizable claim for relief under the Surface Transportation Assistance Act.

### E.  Dormant Commerce Clause

-18-

The plaintiffs assert that the defendants' inaction violates the Commerce Clause of the federal Constitution.  The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . ."  U.S. Const. art. I, § 8, cl. 3.  "[T]he Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  The "dormant Commerce Clause" is the negative corollary to this grant of federal power to Congress, which prohibits certain State regulation of interstate commerce.  It is "the principle that state and local laws are unconstitutional if they place an undue burden on interstate commerce."  *See* Erwin Chemerinsky, Constitutional Law: Principles & Policies § 5.3.1, at 419 (3d ed. 2006).  Under this doctrine, states are free to enact laws regulating "matters of local state concern, even though [these laws] in some measure affect[] the commerce, provided [they] do[] not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern."  *S. Pac. Co. v. State of Arizona ex rel. Sullivan*, 325 U.S. 761, 770 (1945).  The dormant Commerce Clause prohibits States from "build[ing] up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States."  *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272-73 (1984) (internal quotation marks and citation omitted; alteration in original) (striking down as unconstitutional a Hawaii excise tax that exempted beverages produced within the State).

"When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [courts] have generally struck down the statute without further inquiry."  *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986).  To escape invalidation, the State must show that a statute

-19-

or regulation effectuating discriminatory treatment of non-residents is "demonstrably justified." *Granholm v. Heald*, 544 U.S. 460, 492 (2005) (quoting *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 (1992)).   Where the state employs nondiscriminatory means to regulate interstate commerce, the "proper standard" for determining whether that statute violates the Commerce Clause is "whether the burden the statute imposes on interstate commerce is 'clearly excessive in relation to the putative local benefits.'"  *CSX Transp., Inc. v. City of Plymouth*, 283 F.3d 812, 818 (6th Cir. 2002) (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).

The plaintiffs contend that the "Closure Order" violates the Commerce Clause because it blocks the free flow of travel between the interstate highways and the Ambassador Bridge.   The intervening plaintiffs argue that the Gateway Project Agreement is the equivalent of law.  However, as noted above, the plaintiffs fail to identify a state law, regulation, or other official pronouncement that has the force of law.  There is no direct regulation at issue here.

Indirect effects on federal commerce may be actionable under the Commerce Clause.  Even so, the states are free to regulate local issues — here a local construction project —  provided that the regulation "does not materially restrict the free flow of commerce across state lines." *S. Pac. Co.*, 325 U.S. at 770.  As noted above, the plaintiffs continue to be able to access the Bridge via city streets, as they had historically been able to do prior to the commencement of the Gateway Project. There can be no doubt that the ramps will enhance traffic flow.  But there is no contention that the defendants have interfered with existing Bridge access.  Moreover, there is no allegation that the defendants' actions discriminate in favor of a *private* enterprise. *See United Haulers*, 550 U.S. at 343 (restricting application of the dormant Commerce Clause to laws that benefit private, not public, interests, reasoning that "[t]he contrary approach of treating public and private entities the same

-20-

under the dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government.  The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition").  Instead, they affect all motorists the same, regardless of state citizenship, and there is no allegation of economic protectionism to support a dormant Commerce Clause challenge.

### F.  Other issues

The defendants also assert that the claims in the amended complaint are barred by the Eleventh Amendment.  The Court reads the amended complaint and intervenors' complaint as seeking no more than an injunction against state action that is preempted by section 14501(c)(1) and a declaration of their rights under the Supremacy Clause and other federal statutes.  They do not seek damages or other forms of compensatory relief.

State sovereign immunity as recognized by the Eleventh Amendment does not extend to suits against state officials seeking to enjoin violations of federal law.  *Ex parte Young*, 209 U.S. 123, 159-160 (1908).  A plaintiff can "avoid[] this sovereign immunity bar by suing for injunctive or declaratory relief, rather than monetary relief."  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 n.1 (6th Cir. 2004) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)).  To determine whether a claim for such relief avoids sovereign immunity, "'a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 616 (6th Cir. 2003) (quoting *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).

Here, there is no clear statement in the complaint that the plaintiffs seek damages or other forms of monetary relief, which would not be recoverable against these defendants in their official capacity due to the Eleventh Amendment bar. *See Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324-25 (6th Cir. 2010).

The plaintiffs also allege a claim of nuisance under state law. Federal courts have jurisdiction over state law claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court also has discretion to "decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

In this case, the Court is dismissing all of the federal claims, which form the basis of the Court's original jurisdiction. "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996); *see also* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it ha[d] original jurisdiction"). The Court believes that discretion compels declining jurisdiction over the nuisance claim in this case for that reason.

Another important, perhaps overriding, consideration weighs heavily against exercising supplemental jurisdiction in this case as well. As the Sixth Circuit has noted, "[a] district court may

-22-

also 'consider whether the plaintiff has engaged in any manipulative tactics when it decides whether to remand a case.  If the plaintiff has attempted to manipulate the forum, the court should take this behavior into account' in determining whether the balance of factors supports a remand of the state-law claims." *Gamel*, 625 F.3d at 952 (quoting *Carnegie-Mellon*, 484 U.S. at 357).  The present case falls squarely within that rubric.  From the standpoint of the named plaintiffs, who are affiliated with the controlling interests of DIBC, and apparently the intervening plaintiffs as well, the case represents another attempt to gain an upper hand in the dispute between the state and DIBC over completion of DIBC's portion of the Gateway Project.

As noted earlier, DIBC and MDOT are involved in litigation over that issue pending in the Wayne County, Michigan circuit court.  DIBC attempted to remove that case to this Court, with support from some of the same freight companies who have intervened in the present case.  In granting the State's motion to remand, another judge of this Court wrote:

> On September 21, 2010, the Detroit International Bridge Company ("DBIC") removed this action for a second time from the Wayne County Circuit Court asserting federal question jurisdiction.  On September 27, 2010, the Michigan Department of Transportation ("MDOT") filed an emergency motion for remand and for costs and fees.  That motion has been fully briefed.  In the meantime, the Court has been flooded with motions filed by DIBC and parties scheming with DBIC to keep the action in federal court.  Considering this Court's more than thirty-three years as a judicial officer, DBIC may be entitled to its recognition as the party who has devised the most creative schemes and maneuvers to delay compliance with a court order.

*Mich. Dep't of Trans. v. Det. Int'l Bridge Co.*, No. 10-13767, Op. and Order of Remand [dkt #30] at 1-2 (footnote omitted) (Nov. 5, 2010) (Duggan, J.).  Because the present case can be seen as another such "maneuver," the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

III.  Conclusion

-23-

The Court finds that it has jurisdiction over the plaintiffs' and intervening plaintiffs' claims brought under the Supremacy Clause and the Commerce Clause, but they have failed to state claims under those constitutional provisions for which relief can be granted. The claims brought under other federal statutes and regulations may not proceed because those statutes and regulations do not create private rights of action, and to that extent, the Court does not have subject matter jurisdiction over them. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. at 814. The Court declines to exercise supplemental jurisdiction over the state law claim of nuisance.

The plaintiffs filed a motion to strike the affidavit of Victor Judnic that was filed along with the defendants' motion to dismiss. Because the Court did not consider that affidavit in deciding the motion to dismiss, no action need be taken on that motion, and it is moot. Likewise, the plaintiffs' motion to allow discovery has been rendered moot by the present opinion and order.

The dismissal of the case constitutes a denial of the motion and emergency motions for a preliminary injunction.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss [dkt. #13] is **GRANTED**.

It is further **ORDERED** that Counts I through III and Count V of the amended complaint and all counts of the intervenors' complaint are **DISMISSED WITH PREJUDICE**. Count IV of the amended complaint is **DISMISSED WITHOUT PREJUDICE**.

It is further **ORDERED** that the motion for preliminary injunction [dkt. #8] and the emergency motions for preliminary injunction [dkt. #81, 82, 83] are **DENIED**.

It is further **ORDERED** that the motions to strike the affidavit of Victor Judnic [dkt. #36], and the motion for discovery [dkt. #37] are **DENIED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  January 13, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 13, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL